OWENS v. OWENS
2023 OK 12
Case Number: 119920
Decided: 02/14/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2023 OK 12, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

In re Marriage of
K. OWENS, Petitioner / Appellee,
v.
A. OWENS, Respondent / Appellant.
OPINION
¶0 In this divorce proceeding, Wife (Respondent/Appellant) appeals the property division incorporated into the divorce decree. The parties initially agreed to a settlement after mediation, but Wife later changed her mind. Husband (Petitioner/Appellee) moved to enforce the settlement agreement, and the trial court held a hearing on the request. The trial court's divorce decree divided property between the parties based on information provided at the settlement conference and the hearing. Wife contended that the court's property division was unfair, and she appealed. This Court questioned the timeliness of Wife's appeal but allowed the appeal to proceed, reserving consideration of the timeliness issue until the decisional stage. We hold that Wife's appeal of the trial court's judgment was timely, and that the property division reached by the trial court was fair, just, and reasonable.
JUDGMENT OF THE TRIAL COURT AFFIRMED.
Joseph R. Farris, Tulsa, Oklahoma, for Petitioner/Appellee.
Melissa F. Cornell, Tulsa, Oklahoma, for Respondent/Appellant.
KUEHN, J.:
¶1 The issues before the Court are (1) whether Wife's appeal of the trial court's divorce decree was timely filed, and (2) whether the trial court's division of property in that decree was fair. We answer both questions in the affirmative.
BACKGROUND
¶2 Husband and Wife married in 1992. Husband filed for divorce in Tulsa County District Court in April 2019. The only disputed issues involve the division of property. In August 2020, after several months of discovery and with the advice of counsel, the parties agreed to mediation. Husband brought a spreadsheet to the meeting that listed proposed assets and liabilities. The mediator made handwritten amendments to the spreadsheet during the meeting. The parties agreed to the changes, and both parties signed the settlement agreement. The agreement valued the marital estate at just over $780,000: it provided that Husband receive assets valued at approximately $344,700, and Wife receive assets valued at approximately $435,600. Husband's attorney was to draft a decree memorializing the agreement. Wife's counsel subsequently informed Husband's counsel that Wife refused to honor the signed agreement. Soon thereafter, Wife's counsel withdrew from the case.
¶3 In September 2020, Husband filed a motion to enforce the mediation agreement. The Honorable James R. Huber, District Judge, set a hearing for mid-November. Wife hired new counsel, who entered an appearance in early October. Counsel's request for additional time to prepare was granted. The hearing was held December 9 and 16, 2020. The only witnesses called were Husband and Wife. Each presented documentary exhibits to support their respective arguments. The trial court's order granting the motion to enforce was filed in February 2021, and the court issued its Decree of Dissolution of Marriage in September 2021. Wife appeals the trial court's property division.
I. TIMELINESS OF THE APPEAL
¶4 Because the trial court's judgment was prepared by Husband's counsel, Husband was obligated to serve a copy of the judgment on Wife. . There is no question that Husband's counsel mailed a copy to Wife's counsel. Nor is there a dispute over when he sent it, or when Wife's counsel received it. The issue is whether any of this information -- obtained after the appeal was lodged -- matters.

Section 990A(A) of Title 12, Oklahoma Statutes, provides:
An appeal to the Supreme Court of Oklahoma, if taken, must be commenced by filing a petition in error with the Clerk of the Supreme Court of Oklahoma within thirty (30) days from the date a judgment, decree, or appealable order prepared in conformance with Section 696.3 of this title is filed with the clerk of the trial court. If the appellant did not prepare the judgment, decree, or appealable order, and Section 696.2 of this title required a copy of the judgment, decree, or appealable order to be served upon the appellant, and the court records do not reflect the service of a copy of the judgment, decree, or appealable order to the appellant within three (3) days, exclusive of weekends and holidays, after the filing of the judgment, decree, or appealable order, the petition in error may be filed within thirty (30) days after the earliest date on which the court records show that a copy of the judgment, decree, or appealable order was served upon the appellant.

(A) (emphasis added).
¶5 Under this provision, if the party wishing to appeal also happens to have prepared the judgment, the 30-day clock begins on the date the judgment is filed with the court clerk. Otherwise, the appeal clock does not start until proof of service on the aggrieved party has been filed of record. There is a reward for promptness, however. If proof of service is filed within three business days of the filing of the judgment itself (as required by Section 696.2(B)), then the appeal start date is "backdated" to the earlier date. It is undisputed that Section 990A(A) applies to the type of judgment issued in this case.
¶6 In this case, the trial court's judgment was filed with the court clerk on September 10, 2021. It includes a certificate of service which, although signed by Husband's counsel, contains only blanks where the date of service would be inserted. Wife mailed her petition in error to this Court on October 13, 2021 -- more than 30 days after the filing of the judgment. However, given the blank spaces on the certificate of service, it is not clear from the trial court record when Husband's counsel mailed the judgment to Wife's counsel.
¶7 We directed the parties to address the timeliness of the appeal in more detail. Husband's counsel states that he mailed the judgment to Wife's counsel on September 13. Since this was no more than three business days after the filing of the judgment on September 10, Husband's counsel claims the 30-day appeal clock should start on the earlier date. Wife does not dispute when Husband's counsel mailed the judgment. She merely claims that because his certificate of service was incomplete, the court record does not reflect that he did so, as Section 990A clearly seems to require. Wife's counsel says she received actual notice of the filing of the judgment on September 15. Relying on Tidemark Exploration, Inc. v. Good, , , she claims that because the certificate of service was incomplete, appeal time should begin the day she received actual notice of the filing of the judgment (September 15), which renders her petition (October 13) timely.
¶8 We first consider whether Husband's incomplete certificate of service was sufficient to start the 30-day appeal clock under (A). We then consider whether this Court's practice of inquiring into "actual notice" to determine timeliness of appeals should be continued.
A. The certificate of service was not sufficient to trigger the 30-day window described in § 990A(A).
¶9 We must determine whether, under Section 990A(A), "court records [] reflect" that service was accomplished within three business days after the judgment was filed. The requirements for proof of service are found in Rule 2(b)(iii), Rules of the District Courts, 12 O.S.2021, Ch. 2, App., which provides in relevant part (with emphasis added):
Proof of service, whether made by delivery or mail, shall be made by the certificate of an attorney of record, or if made by any other person, by the affidavit of such person. Such certificate or affidavit shall set forth the name of the person served and the date, place and method of service, and it shall be filed with the court clerk or it shall be endorsed upon the pleading, motion or instrument that is filed with the clerk. ...
¶10 Fair notice is fundamental to the guarantee of due process. We have held that proof of service, when required, is a slight burden when balanced against that fundamental right. Brooks v. Baltz, , ¶ 6, , 469. We have also held that statutes granting the right of appeal should be liberally construed to achieve the intended goal. See, e.g., Jackson v. Huddleston, , ¶ 6, , 134.
¶11 Wife contends that the timeliness of her appeal should be considered with reference to what is shown in the district court record as of the date the petition in error is filed, and not sometime after. We agree. From the trial court record available at the time Wife's petition in error was received by this Court, it simply is not clear when (indeed, if) Husband's counsel served a copy of the judgment on Wife. The fact that we now know he did, after receiving additional information from the parties, only underscores the problem with this Court's current practice of adjudicating the timeliness of appeals, which we discuss below. Because the district court record did not clearly reflect -- at the time Wife's petition in error was received by this Court -- that service was accomplished at all, we conclude that Wife's appeal is timely.
B. An aggrieved party's actual notice of the filing of an appealable order does not serve as a substitute for the obligations prescribed in (A).
¶12 In several cases, this Court has departed from the language of Section 990A(A), and applied an "actual notice" test to determine if an appeal was timely filed. We now reconsider the rationale behind those cases.
¶13 Section 990A was amended in 1997 to include the language (excerpted above) at issue here. The current version makes record proof of service the trigger for starting the 30-day appeal clock. As noted above, if the party responsible for serving notice of the judgment files proof that he did so within three business days of the filing of the judgment itself, he shortens the appeal time, as the filing of the judgment becomes the starting point. Otherwise, the filing of proof of service is the starting point. The implication is that, if there is no proof of service in the trial record, then the 30-day appeal clock has not yet started.
¶14 This Court's first interpretation of the 1997 amendment was in Tidemark Exploration Inc. v. Good, , . In Tidemark, the order being appealed was pronounced by the trial court at a hearing where lawyers for both parties were present. Over the next few weeks, the lawyers discussed the content of the written order. Appellants' attorney approved a final version. Once appellees' attorney received it, he obtained the judge's signature on it, filed it, then mailed (and faxed) a copy of it to appellants' attorney. The order was filed October 31, 1997, mailed to appellant on November 3, and faxed on November 7. No proof of service was filed at that time.
¶15 The preceding facts surfaced only after the appellants in Tidemark filed their petition in error on March 17, 1998 -- over four months after the appealable order was filed. The lodging of the appeal was apparently prompted by the trial court clerk, who had sent a copy of the filed order to appellants on March 10. (A certificate of service, attesting to this fact, was attached to appellants' petition.) Appellees themselves did not file proof of service until March 23, 1998, almost a week after the petition itself had been filed. Appellees moved to dismiss the appeal as untimely. Relying on the text of Section 990A(A), appellants pointed out that the earliest record of service of the filed order was the court clerk's certificate on March 10, 1998 -- "the first and only certificate of service filed in the district court." Tidemark, , ¶ 4, 967 P.2d at 1195 (emphasis added).
¶16 This Court dismissed the appeal as untimely. Despite the plain text of Section 990A, the majority rejected proof of service as the sine qua non for starting the 30-day appeal clock. To determine when the appeal time started, the Court considered (1) the date the judgment was filed, and (2) the date the appealing party received "actual notice" of the filing of the judgment -- something that cannot usually be determined by reference to the trial court record. In his dissent, Justice Summers (joined by Justice Hodges) noted that this approach departed from the plain language of the statute and wrote, "[t]his Court should not overrule the legislature except for constitutionally required reasons." Id. at ¶ 2, 967 P.2d at 1196 (Summers, J., dissenting).
¶17 Two noteworthy cases followed Tidemark. In Whitehall Homeowners Ass'n. Inc. v. Appletree Enterprise Inc., , , the judgment was filed December 2, 2011. Appellant filed a petition in error on January 4, 2012. The trial record held no proof that the judgment was served on appellant. Appellee moved to dismiss the appeal, claiming to have served a copy of the judgment within three business days of its filing -- which would have made January 2 the deadline for lodging an appeal. Appellant responded with an affidavit from his counsel stating that he received actual notice of the filing of the judgment on December 8. This Court concluded that where the trial record was silent on when proof of service was made, appellant's affidavit, received at the appellate level, could be considered to determine when actual notice was received. Appellee's allegation that it sent notice at an earlier date -- information contained only in a photocopy of a letter attached to appellee's motion to dismiss -- was not disputed, but deemed irrelevant.
¶18 State v. Cedars Group L.L.C., , , involved the timeliness of motions for attorney fees and costs filed in the trial court. The statute in question, , prescribes a 30-day period for such motions, and contains language similar to Section 990A(A). The judgment was filed April 18, 2011, mailed by the plaintiff (who had prepared it) on April 20, and received by defendants on April 21. As in Tidemark and Whitehall, no proof of service appeared in the trial record. When defendants filed their motions on May 20, plaintiff claimed they were out of time. Defendants argued that plaintiff's failure to file proof of service meant the 30-day clock for filing the motions had not yet started. At worst, they argued, the period should begin from when they received actual notice of the judgment.
¶19 The plaintiff in Cedars took Tidemark's actual-notice rule to a new level. Plaintiff argued that because defendants received actual notice within three business days of the filing of the judgment, their 30-day appeal clock should begin on the earlier date. In other words, plaintiff claimed, just as the party charged with providing proof of service is rewarded for filing same within three business days of the filing of the judgment, the party entitled to receive such notice should be penalized if he admits receiving actual notice within that same time frame. The trial court found the motions untimely, and the Court of Civil Appeals affirmed. While this Court ultimately found the motions timely under a statute inapplicable to appeals, it nevertheless reiterated Tidemark's holding that when the party responsible for providing proof of service fails to do so, the Court would reward such inaction by inquiring into when actual notice was received.
¶20 In all three cases -- Tidemark, Whitehall, and Cedars -- the prevailing party failed to file proof of service in the trial record. In each case, this Court resorted to evidence beyond that record to decide if the appeal was timely. In none of the cases was there any dispute over the fact that prompt notice was given by the prevailing party. But the fact remains that gathering this information required time and effort at the appellate level. In Tidemark, the prevailing party urged this Court to disregard its own proof of service (filed only with the appellate court, after the appeal was lodged), and inquiry into actual notice doomed the appeal. In Whitehall, the prevailing party never filed proof of service in any court, and inquiry into actual notice saved the appeal. In Cedars, inquiry into actual notice would have doomed the appeal, except for the intervention of another statute not relevant here.
¶21 Tidemark's analysis, central to all three cases, deserves re-examination.
The reason for the statute's requirement that a certificate of mailing be filed is to establish when the order was mailed in the event there is a dispute about the date that the appealing party received actual notice of the filing of the order, the appealable event. ... The date of the filing of the certificate of mailing is not the appealable event. ... We have long held that actual notice of an appealable event triggers the running of the appeal time. ... The 1997 amendments to do not change this fundamental rule.
Tidemark, , ¶¶ 5-6, 967 P.2d at 1195-96 (emphasis original).
¶22 This analysis is flawed. First, the proof-of-service requirement does not settle disputes over when actual notice was received. What it does, rather, is avoid case-by-case, appellate-level, extra-record inquiry into timeliness of an appeal. It does so by making actual notice irrelevant (except when the appellant prepared the judgment herself, in which case actual notice is inferred). Indeed, there was never any factual dispute in Tidemark, or in Whitehall, or in Cedars, over when actual notice was received. The dispute in those cases was a legal one: whether actual notice mattered.
¶23 Second, Tidemark's observation that proof of service is "not the appealable event" is true, but adds nothing to the analysis. Even Tidemark itself doesn't count appeal time from the date of the appealable event (filing the judgment), but from the date of actual notice of that event. And the fact remains, the statute does not peg appeal time to either of these events.
¶24 Third, by placing actual notice above record notice, Tidemark invites disputes over timely filing in each and every appeal. Nothing in Tidemark's approach bars a prevailing party from challenging the timeliness of an appeal, even after it has duly filed proof of service to cover itself. In fact, that is just what the prevailing party in Tidemark did.
¶25 Finally, Tidemark works against this Court's oft-stated concern over due process for litigants - specifically, fair notice of when one's right to appeal has been put to a stopwatch. Even after Tidemark, we held that failure to provide notice to litigants of judicial events affecting their rights was an impermissible defect in the process. Baltz, , ¶ 6, 12 P.3d at 469. Meanwhile, Tidemark makes proof of service -- even service itself -- complimentary only.
¶26 "Actual notice" that some event has occurred is relevant in some legal contexts. But since it is a fact-specific inquiry, it is not helpful for determining the timeliness of an appeal. That task chiefly depends on routine acts -- signatures, file-stamps, postmarks -- which are easy to identify at the time an appeal is lodged. It is important to note that service, and record proof of service, are related concepts but serve different purposes. The aggrieved party is interested in notice of the judgment, but the victor can serve the loser without anyone else being aware of that fact. Put simply, service of judgments aids litigants; record proof of service aids appellate courts. Section 990A(A) aims to solve both problems -- fair notice for litigants, and efficient administration for courts -- by requiring not just service on the parties, but record proof thereof.
¶27 We have often said we lack jurisdiction to consider untimely appeals. E.g., Rodgers v. Higgins, , ¶ 32, , 413. But since our appellate jurisdiction is controlled by the Legislature, Okla.Const. art. 7, § 4, we would do well to heed any changes it makes to how an appeal may be taken. After all, the Legislature is never presumed to have done a vain thing. Loffland Bros. Equipment v. White, , ¶ 7, , 314. Tidemark and its progeny not only ignore the plain language of Section 990A(A); they reward non-compliance with the statute. In the process, they saddle this Court with fact-finding, which appellate courts are ill-equipped to handle with efficiency and confidence. It now seems evident to us that the changes to Section 990A(A) were intended to assist this Court, not burden it. They establish an efficient method of deciding whether the appeal is timely at the time it is lodged, by reference to information available in the trial record and on the face of the petition itself.
¶28 While each jurisdiction has unique statutes and rules regarding appeal times, the argument that actual knowledge might serve as a substitute for record notice is an old one, and has largely been rejected. Many courts have recognized that when appeal time is affected by an action the prevailing party must take, it actually affords that party a measure of control over the process. And we are hardly alone in recognizing the practical benefits of a text-based approach. One court noted that faithful adherence to language requiring record proof of service
serve[s] to promote clarity, certainty and ease of determination, so that an appellate court will immediately know whether an appeal was perfected in a timely manner, thus eliminating the need for a case-by-case factual determination.
Another court observed, almost a century ago, that strict adherence to a statute requiring written notice of appealable order "has the merit of doing away with disputes as to whether or not a party had actual notice, and will establish a uniform rule of practice... ."
¶29 When the Legislature provides for the right to appeal, that right should be liberally construed. City of Tulsa v. Board of Trustees of Police Pension and Retirement System, , ¶ 8, , 258. Judgments by default are not favored. Nelson v. Nelson, , ¶ 23, , 1228. If the prevailing party desires prompt resolution of an appeal, it should demand as much by promptly serving notice of the appealable order to the aggrieved party and immediately recording proof thereof.
¶30 When applying statutes, our goal is to give effect to legislative intent; if intent is plain from the text, there is nothing for us to do but implement it. Rickard v. Coulimore, , ¶ 5, , 923. Today's pronouncement remains faithful to the plain meaning of Section 990A(A). We now hold that when a petition in error is presented to this Court, we will determine timeliness at that time, from the materials filed with this Court and on file in the trial court record. The petition will be accepted as timely if proof of service is absent, unless it is clear that the appellant prepared the judgment. If proof of service is present, then the date such proof was filed will be used to determine when the 30-day appeal time began. Tidemark, Whitehall, and Cedars are overruled to the extent they are inconsistent with today's pronouncement. Today's decision shall apply prospectively, controlling only those cases filed after the issuance of this opinion.
¶31 We find the instant appeal is timely, and now consider its merits.
II. THE MERITS OF THE APPEAL
A. Standard of review.
¶32 A divorce suit is one of equitable cognizance, in which the trial court has discretionary power to divide the marital estate in a manner that is fair, just, and reasonable. Colclasure v. Colclasure, , ¶ 16, , 1128-29; (B). We will not disturb a trial court's property division unless the court abused its discretion or its decision is clearly against the weight of the evidence. Standefer v. Standefer, , ¶ 19, , 109.
B. Discussion.
¶33 Although Wife sets out four propositions of error, they are closely related and we consider them together for the sake of simplicity. Her chief complaint is that the trial court erroneously considered certain property she had acquired before the marriage as part of the marital estate, subject to equitable division.
¶34 Generally, in a property division arising from a divorce, courts exclude from the marital estate any assets considered to be the separate property of one of the parties. Property acquired during the marriage is presumed to be marital property, accumulated by the joint industry of both spouses, and subject to equitable division; this is so regardless of how title to the property might be held. Gray v. Gray, , ¶ 11, 922 P.3d 615, 619. A party seeking to have an asset acquired during the marriage treated as separate property has the burden of proving that characterization is justified. Standefer, , ¶ 15, 26 P.3d at 108.
¶35 People usually enter marriage with some assets of their own. If these assets are kept segregated, they generally remain separate property, which we have described as "property owned by a spouse before the marriage, which retains its separate status during coverture because it is maintained in an uncommingled state as a spouse's individual property." Thielenhaus v. Thielenhaus, , ¶ 9, , 930--31 (emphasis added). Conversely, if at any time during the marriage, one spouse's separate property is donated to or commingled with assets of the other spouse or of the marital estate, it may lose its character as separate property. ; Standefer, , ¶ 16, 26 P.3d at 108; Umber v. Umber, , ¶¶ 11-12, , 302. The fact that marital property was purchased, in whole or in part, with funds that might be traceable to one spouse or the other, does not, without more, negate the presumption that the property was a gift to the marital estate. See Gray, , ¶ 12, 922 P.2d at 619 ("[A]lthough many pieces of property were purchased with the separate funds of either the plaintiff or the defendant, all of the items bought during the marriage were acquired through the joint industry of the parties").
¶36 Divorcing parties may agree between themselves on how to divide their assets. Public policy favors settlements and compromises over litigation, and that policy applies to dissolutions of marriage. Whitehead v. Whitehead, , ¶¶ 9-10, , 1101. When such an agreement is made, the parties may effectively be abandoning legal claims over what property is "separate" and what property is "marital." In common practice, a list of assets and liabilities is compiled, and the parties "trade" them to reach a mutually acceptable result. However, the trial court still has a duty to independently determine if the agreement is fair, just, and equitable. Dickason v. Dickason, , ¶ 9, , 677. To that end, the court may first consider whether the agreement itself was induced by fraud, coercion, or similar factor casting doubt on its validity. See Limb v. Limb, , ¶¶ 6-8, , 1014-15. It should then consider the particulars of the agreement (in light of any evidence the parties may present) to decide if the terms appear fair. (B); Limb, at ¶¶ 9-11, 156 P.2d at 1015.
¶37 In summary, parties to a marriage may combine their separate assets or keep them separate. Absent evidence of a contrary intent, the commingling of assets for joint use and enjoyment will generally be seen as a donation to the marital estate. If the parties divorce, they may agree to divide their assets as they wish -- subject to final approval of the court. The trial court has broad discretion to consider the agreement that was made, to consider any evidence bearing on its voluntariness, and to make any adjustments necessary to reach a fair, just, and equitable result. With these principles in mind, we return to the facts of this case.
¶38 Wife maintains that her separate property was not fully taken into consideration in the trial court's property distribution. When the parties married in 1992, they lived in a home in Chicago, Illinois, which Wife had been awarded in a prior divorce, but which was at the time still encumbered by a mortgage. From 1992 until 2009, the couple continued making mortgage payments on that house together. In 2009, the couple relocated to Broken Arrow, Oklahoma. A down payment of $100,000 was made on the new home, which was deeded to both parties as joint tenants. That same year, the outstanding balance on the Chicago mortgage (about $22,500) was paid off. Both of these payments appear to have been made from a savings account that Wife had opened at Citizens' Bank before the marriage, and to which the couple, during their marriage, continued to contribute for many years. Together, the parties paid the mortgage on the Broken Arrow home for about a decade. The couple continued to own the Chicago home until 2015, when it was sold. The proceeds of that sale (about $98,000) were deposited in a Western Sun bank account.
¶39 Thus, when this divorce action was filed, the parties had a joint interest in one home: the Broken Arrow residence. Wife claims the down payment on that home was made with her separate property from the Citizens' Bank account. However, the couple took title to the Broken Arrow home as joint tenants, and jointly made payments on its mortgage for approximately ten years. Although Wife had an interest in the Chicago home before the marriage, and used funds from the Citizens' Bank account to pay off its mortgage in 2009, both parties nevertheless contributed to the mortgage payments on that residence for approximately seventeen years. The couple's equity in their Broken Arrow home was an amalgamation of jointly-made mortgage payments and a down payment made from an account that Wife had opened before marriage. The sale of the Chicago home in 2015 was the liquidation of an asset that also commingled separate and marital property.
¶40 Wife did not deny that she and Husband jointly added value to both the Chicago home and the Broken Arrow home through years of mortgage payments. She maintained, however, that she deserved credit for her pre-marriage interest in the Chicago home, her payoff of its mortgage, and for the down payment on the Broken Arrow home. But at the hearing, Wife failed to present evidence that she intended to keep her interests in these properties separate from the marital estate. What is more, Wife could not provide any way to value her pre-marriage interest in the Citizens' Bank account, which funded the payoff of the Chicago home and the down payment on the Broken Arrow home.
¶41 Again, we consider the posture of this case. This is not an appeal after a trial, where the valuation and character of property might be thoroughly contested. Rather, Husband sought to enforce a settlement that the parties initially agreed upon, but which Wife later repudiated. Wife claims that as the party seeking to enforce the agreement, Husband carried the burden of proof. Husband had the burden of convincing the court that the agreement was valid and fair. This is more accurately called the burden of persuasion, which simply means that if the evidence is "evenly balanced," Husband must lose. See Jackson v. Oklahoma Memorial Hosp., , ¶ 9 n.18, , 770 n.18.
¶42 Husband presented the agreement signed by the parties (Wife stipulated to as much) and testified that in his opinion, it was fair. A facially valid agreement carries a presumption that the parties understood what they were doing and reached a mutually acceptable result. Once the court was presented with such an agreement, the burden of production -- the obligation to come forward with evidence to challenge the agreement -- shifted to Wife. See Green v. Green, , ¶ 5, , 912. This makes sense, since Husband could not reasonably be expected to guess what Wife's challenges would be, and Wife was the party most likely to possess any evidence to support whatever challenges she might make.
¶43 There is no dispute that the parties -- with advice of counsel -- voluntarily undertook settlement negotiations, and that they reached an agreement on how to determine and divide their property. They did so after several months of discovery, where they had time to gather relevant financial information and develop strategies based on available facts and existing law. Wife initially concurred in the settlement. The freedom to negotiate a property settlement implies the freedom to forgo potential claims that particular assets should be deemed separate property. In seeking to reject the agreement, Wife made no claim that it was the product of fraud, mistake, or coercion. Nor did she claim that her original counsel misadvised her on any point of law. Rather, Wife's position at the hearing seemed to be a simple change of strategy.
¶44 With no evidence to rebut the presumption that the agreement was valid, the trial court undertook its statutory duty to consider whether it was fair, just, and equitable. (B); Wheeler v. Wheeler, , ¶ 14, , 308. The court received documentary evidence and testimony from the parties. It questioned Wife at length about the nature of the assets at issue, and the feasibility of her uncovering additional evidence to support her arguments. Wife did not deny that the allegedly separate assets were commingled with assets accumulated through joint industry during the marriage. She presented no evidence that she intended to keep any of the assets in question segregated from the marital estate. Finally, the trial court did not rubber-stamp the terms of the settlement agreement; it accepted Wife's claims that certain bank account figures were inaccurate, and it corrected them accordingly.
¶45 Wife also claims the trial court did not fully consider factors relevant to the basic fairness of the property division, e.g. the parties' ages, employment prospects, etc. These factors are certainly relevant, but again, we consider the posture of this case. Wife initially found the settlement terms acceptable to her. At the hearing, both parties testified briefly about their ages and employment history. But aside from her claims concerning separate property, Wife did not advance any particular reasons for why she deserved to receive more than the settlement provided, or just how much more was appropriate. The trial court could only consider information that the parties provided to it, and we have no reason to believe that it did not fully consider all the evidence that it received. See Standefer, , ¶ 21, 26 P.3d at 109.
III. CONCLUSION
¶46 To summarize: Wife presented no evidence to rebut the presumption that she voluntarily entered into the settlement agreement. As to her claims of separate property, Wife presented no reasonably specific valuation of those contributions, no reasonable probability that they could ever be valued in the future, and no evidence that she intended to keep these assets separate from the marital estate. Considering all of the evidence presented to it, the trial court awarded Wife approximately 56% of the couple's combined assets. Under these circumstances, we cannot say the trial court abused its discretion. The trial court's decree on dissolution of marriage is therefore AFFIRMED.
CONCUR: KANE, C.J., ROWE, V.C.J., WINCHESTER, EDMONDSON, COMBS, GURICH, AND KUEHN, JJ.
CONCUR IN RESULT: DARBY, J.
CONCUR IN PART/DISSENT IN PART: KAUGER, J. (BY SEPARATE WRITING)
FOOTNOTES
 We use the word "judgment" or "order" interchangeably to refer to any appealable order that is covered by Section 990A.
 The last page of the decree is entitled, "Certificate of Service of Judgment, Decree or Appealable Order Pursuant to , as amended." The text states that Husband's counsel certifies he mailed a file-stamped copy of the decree to Wife's counsel. Husband's counsel signed the certificate of service. However, there are two places on the form where a date was to be entered, and both of them are blank.
 Although Wife's petition was received by this Court on October 14, it is considered to have been filed on the date of mailing. Rule 1.4(c), Oklahoma Supreme Court Rules, 12 O.S.2021, Ch. 15, App. 1; Whitehead v. Tulsa Public Schools, , .
 In November 2021, this Court directed Wife to show cause why her appeal should not be dismissed as untimely, specifically asking her to provide information on when she received actual notice of the filing of the judgment. We retained the matter for appeal, reserved the timeliness issue until the decisional stage, and invited the parties to address the issue in their briefs. In May 2022, Husband's counsel located additional information relating to the date service of the judgment was accomplished. We granted leave to supplement the appeal record with that information, which corroborates that Husband's counsel mailed the judgment to Wife's counsel on September 13.
 Because the 30th.
 The same 1997 legislation which added the text we consider in Section 990A also added similar language to a number of other statutes, including the one governing appeals where post-trial motions have been filed, and the one governing interlocutory appeals. See (C), 993(A). See generally Laws 1997, ch. 102.
Ensuring that litigants receive prompt notice of judgments has been a persistent problem. Trial judges might rule from the bench, or they might take the matter "under advisement." Judges might draft a judgment themselves. They might have it filed with the court clerk, or wait for one of the parties' attorneys to retrieve it. They might contact the parties before the judgment is reduced to writing and tell them what it will say. Or the judge might assign the task of preparing the judgment to one of the parties (typically the prevailing one). The losing party might approve a draft of the judgment as to form (but objecting to its contents), or might repudiate such a courtesy. The court clerk receiving the judgment might file it, but neglect to send copies to the parties. And so on. These scenarios made it unclear when a litigant should be charged with notice of a decision, which affected their right to file an appeal or any number of post-decisional motions.
To reduce the confusion, our Legislature has attempted over the years to streamline the process. A judgment was once considered appealable on its "effective pronouncement." Grant Square Bank & Trust Co. v. Werner, , ¶ 5, , 111 (judge's unfiled letter to parties informing them of intended ruling started appeal time). In 1991, judgments became appealable when filed -- an event more readily verifiable (for appellate courts) than the date of pronouncement. But a distinction between judgments "taken under advisement" and those which are not persisted until 1997. Before then, if the matter was taken under advisement, the petition was due 30 days from the date that a file-stamped copy was mailed to the appealing party, as indicated on the certificate of mailing. As of 1997, the right to appeal a judgment - any judgment falling under section 990A, not just those taken under advisement - can be limited by filing proof of service to other litigants with the court clerk.
 (D), giving a party three additional days to perform certain acts when using certain delivery methods.
 The date that the judgment was filed is only relevant if (1) proof of service is filed within three business days thereof, or (2) appellant prepared the judgment herself. Actual notice has little to do with the date that proof of service is filed. Except in the case of hand-delivery, a party is unlikely to receive notice the same day it was sent.
 Suppose, for example, a judgment is filed with the court clerk (Day 0). Prevailing party files proof of service ten days later (Day 10). Appellant's petition in error is filed 30 days after that (Day 40). Prevailing party moves to dismiss the appeal, claiming to have evidence that appellant received actual notice of the filing of the judgment, by some other method, on some date earlier than Day 10.
 "[F]actfinding is the basic responsibility of district courts, rather than appellate courts...." DeMarco v. United States, 415 U.S. 449, 450 n.* (1974).
 See, e.g., In re Natural Resources Recovery, Inc., 752 So.2d 369, 375 (La.App. 2000) ("Actual knowledge, absent compliance with mailing or service requirements when notice is required, is not sufficient to cause an appeal delay to commence"); Turner v. Barnes, 687 So.2d 197, 198 (Ala. 1997) (rule requiring court clerk to notify litigants by mail of appealable order was not merely "aspirational"; nothing in the rule suggested that "other means of giving notice to the parties may be substituted"); Matter of Estate of Holmes, 599 P.2d 344, 347 (Mont. 1979) (under court rule requiring service by court clerk, appeal time did not begin to run until service was made; actual notice irrelevant); Strand v. Chicago Great Western Rwy. Co., 179 N.W. 369, 370 (Minn. 1920) (30-day appeal clock triggered by "written notice [] from the adverse party"; actual notice irrelevant); People v. Spalding, 9 Paige Ch. 607 (N.Y.Ch. 1842) (actual knowledge did not substitute for formal notice of appealable order).
 
[T]he statute requires that in order to limit the time for appealing, written notice must be given of the entry of the order. This is a limitation upon the right of appeal, and the prevailing party can set the statute running against his adversary by giving the written notice prescribed therein. He has the whole matter under his control, and can set the statute running when he pleases.
Corwith v. State Bank of Illinois, 18 Wis. 560, 564 (1864) (emphasis added). See also Kallstrom v. Marshall Beverages, Inc., 397 N.W.2d 647, 650 (S.D.1986) (citation omitted) ("A notice of entry of judgment gives to a party the power to set running the time after which his adversary may not appeal and assures each party that the statutory period of time within which he may appeal does not commence to run until his adversary has given such notice"); Lake v. Moore, 12 S.C. 563, 563-64 (1879) ("The object of the notice is to apprise the appellant that the respondent intends to insist on an appeal within the time fixed by law, and unless such notice is given the appellant is unrestricted as it regards the time within which an appeal may be taken") (emphasis added).
 Frazier v. City of Philadelphia, 735 A.2d 113, 115 (Pa. 1999) (express language of court rule started appeal time after clerk's docket notation that notice had been given to parties; party's actual notice of ruling before clerk's notice was irrelevant).
 In re Judicial Ditch No. 2, Houston County, 202 N.W. 52, 53 (Minn. 1925).
 While proof of service is required to start the appeal clock, absence of such proof in the record does not prevent the aggrieved party from lodging her appeal anyway. "Receipt of notice of filing served by the adverse party is not a prerequisite to appeal." Probst v. Holland, 441 N.W.2d 836, 837 (Minn.App. 1989) (emphasis original).
 Some courts hold that, even when record proof of service is absent, appeal time will start if the aggrieved party takes some affirmative action, evident from the record, which evinces actual knowledge. See, e.g., Gierke v. Gierke, 1998 ND 100, ¶ 11, 578 N.W.2d 522, 526; State v. First Judicial Dist. Court, 38 Utah 138, 110 P. 981, 983 (1910) ("Where the [appealing] party not only has knowledge but acts upon such knowledge, and such action appears of record, there is a distinct act of waiver -- the written notice which would otherwise have been necessary is dispensed with by the act of the party") (citation omitted, emphasis added). We express no opinion on whether equitable doctrines, such as estoppel or laches, might be relevant in such extreme cases.
 
The court shall enter its decree confirming in each spouse the property owned by him or her before marriage and the undisposed-of property acquired after marriage by him or her in his or her own right. ... As to such property, whether real or personal, which has been acquired by the parties jointly during their marriage, whether the title thereto be in either or both of said parties, the court shall, subject to a valid antenuptial contract in writing, make such division between the parties as may appear just and reasonable, by a division of the property in kind, or by setting the same apart to one of the parties, and requiring the other thereof to be paid such sum as may be just and proper to effect a fair and just division thereof. ...
(B).
 Wife's claims are generally overlapping, but at times inconsistent with one another. She claims: (1) the trial court abused its discretion by enforcing the settlement agreement, abdicating its duty to determine independently whether the agreement was fair, just, and equitable; (2) the trial court abused its discretion by making and adopting changes to the settlement agreement without the parties' consent; (3) the trial court erred when it included Wife's separate property as part of the marital estate; and (4) the trial court erred when it found that Husband had made a prima facie case that the settlement agreement was fair.
 In Gray, we held that even where property would be statutorily exempt from equitable distribution, it can lose that character once it is converted to some type of property that is not exempt. In Gray, the husband argued that his veteran's disability benefits were exempt by law from distribution in his divorce. We held, however, that once the husband used those funds to purchase assets enjoyed by both parties, he could no longer take advantage of the exemption. Wife makes a similar argument: that because some marital assets included (or were in part purchased with) funds that were once her separate property, the value of those assets as part of the marital estate should be reduced proportionately.
 "Such an agreement between the parties is enforceable and valid even though it does what a trial court cannot do, provided the agreement does not contravene public policy. ... [T]he legislature did not intend to preclude parties, in contemplation of divorce, from freely contracting with respect to disposition of their property and alimony for support." Whitehead, at ¶ 10, 995 P.2d at 1101 (citation omitted).
 At the hearing, Husband was prepared to call Wife's first lawyer to establish that Wife was, in fact, fully informed on the concepts of separate and marital property before she signed the agreement. However, Husband could not present the attorney's testimony unless Wife waived the attorney-client privilege by affirmatively claiming the attorney gave her bad advice. (D)(3); Tiger v. Lozier, , ¶ 15, , 729-30 ("The authorities generally hold that a client who goes upon the stand in an attempt to secure advantage by reason of transactions between himself and his counsel waives his right to object to the attorney being called by the other side to give his account of the matter") (quoting Grant v. Harris, 116 Va. 642, 82 S.E. 718, 720 (1914)). Wife made no such claim at the hearing, so the attorney did not testify.
 See Catron v. First Nat. Bank & Trust Co. of Tulsa, , ¶ 21, , 270 ("The numerous realty transactions, the intermingling of funds in various bank accounts, the lost or missing records, coupled with the indiscriminate use of funds without regard to source [] make the task of tracing and resegregating assets a manifest impossibility in this case").

KAUGER, J., concurring in part/dissenting in part:
¶1 I disagree with the majority's abrupt reversal of our holdings in Tidemark Exploration, Inc.v. Good, , , Whitehall Homeowners Ass'n Inc. v. Appletree Enterprise, Inc., , , and State v. Cedars Group L.L.C., , which allowed actual notice to be considered. Not only are they long standing interpretations of the law, they are so entrenched in it that their interpretations of should be amended by the Legislature.
¶2 Court rules and Administrative rules are valid expressions of lawmaking powers and have the full force and effect of law. When a rule or statute has been judicially construed by a court of last resort and is reenacted in the same or substantially the same terms as it was judicially construed, its meaning is adopted by the Legislature. Legislative silence is evidence of lawmakers' consent and adoption of construction.
¶3 The judicial construction becomes an integral part of the statute. Upon completion of the compilation of the statutes and approval by the Court, all the laws contained therein become the laws of the state. If a statute is re-enacted, or in this case re-codified, in the same or substantially the same terms after a judicial construction, the court's meaning is presumed to have been adopted by the Legislature.
¶4 Obviously §990A needs attention. The three day rule causes more problems than it solves, and a bright line may be helpful. (It would also be helpful if all petitions for relief were uniformly set at 30 days regardless of the forum.) However, for the last 25 years, the bench and bar have relied on the Court's Tidemark, interpretation to include actual notice.
¶5 The statute has been re-codified two or three times. If the Legislature were dissatisfied with the Tidemark interpretation, it has had decades to correct it. Amendment to §990A is for the Legislature, not this Court. Such an abrupt change could cause chaos -- not to mention the obliteration of the sufficiency of actual notice.
FOOTNOTES
 Title provides in pertinent part:
A. An appeal to the Supreme Court of Oklahoma, if taken, must be commenced by filing a petition in error with the Clerk of the Supreme Court of Oklahoma within thirty (30) days from the date a judgment, decree, or appealable order prepared in conformance with Section 696.3 of this title is filed with the clerk of the trial court. If the appellant did not prepare the judgment, decree, or appealable order, and Section 696.2 of this title required a copy of the judgment, decree, or appealable order to be served upon the appellant, and the court records do not reflect the service of a copy of the judgment, decree, or appealable order to the appellant within three (3) days, exclusive of weekends and holidays, after the filing of the judgment, decree, or appealable order, the petition in error may be filed within thirty (30) days after the earliest date on which the court records show that a copy of the judgment, decree, or appealable order was served upon the appellant.
B. The filing of the petition in error may be accomplished either by delivery or mailing by certified or first-class mail, postage prepaid, to the Clerk of the Supreme Court. The date of filing or the date of mailing, as shown by the postmark affixed by the post office or other proof from the post office of the date of mailing, shall constitute the date of filing of the petition in error. If there is no proof from the post office of the date of mailing, the date of receipt by the Clerk of the Supreme Court shall constitute the date of filing of the petition in error.
C. The Supreme Court shall provide by rule, which shall have the force of statute, and be in furtherance of this method of appeal:
1. For the filing of cross-appeals;
2. The procedure to be followed by the trial courts or tribunals in the preparation and authentication of transcripts and records in cases appealed under this act; and

3. The procedure to be followed for the completion and submission of the appeal taken hereunder. . . .

 Bertrand v. Laura Dester Center, , ¶14, ; Estes v. ConocoPhillips Co., , ; Renfrow v. Ittleson, , .
 Suldbury v. Deterding, , ¶16, ; Special Indemnity Fund v. Bedford, , ¶8, .
 Estes v. ConocoPhillips Co., see note 2 at ¶11. See also, 75 O.S. 2011 §308.5 which provides:
A. No agency rule is valid or effective against any person or party, or may be invoked by the agency for any purpose, until it has been promulgated as required in the Administrative Procedures Act.
B. A proceeding to contest any promulgated rule on the ground of noncompliance with the procedural requirements of Article I of the Administrative Procedures Act must be commenced within two (2) years from the effective date of the promulgated rule.
C. Rules shall be valid and binding on persons they affect, and shall have the force of law unless amended or revised or unless a court of competent jurisdiction determines otherwise. Except as otherwise provided by law, rules shall be prima facie evidence of the proper interpretation of the matter to which they refer.
 Ex Parte Haley, , ; See, Atchley v. Board of Barber Examiners of State, , .
 Compsource Mut. Ins. v. State ex rel. Okla. Tax Comm'n, , ¶27, ; Suldbury v. Deterding, see note 3, supra.